IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.                                                          CRIMINAL CASE NO. 1:22-CR-69-SA

JABARI OGBONNA EDWARDS and
ANTWANN RICHARDSON                                          DEFENDANTS

ORDER AND MEMORANDUM OPINION

This trial of this criminal action is currently set to commence on January 22, 2024. Presently before the Court are numerous pending Motions [137, 139, 147, 148, 149, 159, 161] spanning a range of topics. The Court held a hearing on August 23, 2023, at which time the parties presented arguments as to each of these filings.[1] Having considered the filings, as well as the arguments presented at the hearing, the Court is prepared to rule.[2]

I.    *Notice of Potential Conflict of Interest and Motion for Hearing [137]*

On July 13, 2023, the Government formally raised the issue of Wilbur O. Colom, Esq.'s continued involvement as counsel of record in this case, specifically averring that a conflict of interest might exist with Colom's representation of Edwards. A brief recitation of several pertinent facts regarding Colom's involvement in the case is necessary to provide appropriate context.

The Defendants were indicted on June 15, 2022. Richardson was charged with wire fraud, conspiracy to commit wire fraud, and money laundering. Edwards was charged with those same charges, as well as two separate false statements charges. The Indictment [1] alleges that Edwards "was the president and owner of many companies, including North Atlantic Security, J5

---

[1] Since that hearing, Edwards has filed additional Motions. Those Motions will be addressed in due course.

[2] Defense counsel, Chandler Rogers, Esq.'s, Motion [172] to be excused from one day of trial is DENIED AS MOOT, as the request raised a scheduling conflict with a trial date that has previously been continued.

Solutions LLC, Edwards Enterprises LLC, J5 GBL, LLC, The Bridge Group, BH Properties, and Build Development Group." [1] at p. 1-2. As to Richardson, the Indictment [1] alleges that he "was the Vice President of North Atlantic Security and manager of Edwards's other businesses." *Id*. at p. 2. In essence, the allegations against the Defendants are that they fraudulently obtained PPP and EIDL funds to which they were not entitled.[3]

Both Defendants were arrested on June 16, 2022—the day after the Indictment [1] was filed. Shortly after being arrested, Edwards was interviewed, during which time he allegedly made incriminating statements to SIGTARP Special Agents Richard Vignogna and Dietrich Bohmer.[4] Counsel was not present with Edwards at the time of the interview. Later that day, Edwards and Richardson jointly appeared before this Court for their initial appearances. Colom was present at that hearing. When Magistrate Judge Percy inquired of the status of Colom's presence, Colom advised the Court that he was only there for the initial appearances and specifically advised the Court that he would *not* be an attorney of record in the case. As the hearing progressed, Magistrate Judge Percy began to go over the charges with the Defendants, at which time Colom interjected to advise the Court that the Defendants had already had an opportunity to review the charges against them.

The next day, this Court entered a Restraining Order [10], which froze certain financial accounts in the names of J5 Solutions, LLC; North Atlantic Security; J5 GBL, LLC; Edwards Enterprises, LLC; BH Properties; Build Development Group; and Richardson. The Restraining

---

[3] A Superseding Indictment [60] has since been filed. However, for purposes of the present filing, the date of the original Indictment [1] and the ensuing events are pertinent.

[4] The interview was the subject of a suppression hearing held on April 11-12, 2023. In an oral ruling, the Court held that Edwards' alleged statements are admissible. The Court notes this issue for context but sees no need to provide a further explanation of the pertinent suppression issues for purposes of the present matters.

Order [10] also restrained the disposition of two pieces of real property—Court Square Tower and another property generally identified as 451 Officer Lake Road.

On June 30, 2022, Agents Vignogna and Bohmer met with Colom as a potential witness.[5] A Memorandum of Investigative Authority ("MOIA") was prepared following that meeting. The MOIA, which is unsigned, is four pages in length and provides the following information at the beginning of it:

> Prior to the start of this interview, Colom was advised of the identities of the interviewing SAs [Special Agents] and the nature of the interview. Colom provided the following statement:
>
> Colom stated that he is not representing Jabari Edwards (Edwards) or Antwan [sic] Richardson (Richardson) with regards to their criminal case. Colom added that he is a Civil Attorney and not a criminal attorney. Colom is "doing the work on the businesses, trying to get accounts released and maintain whatever operations they can." Colom had done civil work in the past for Edwards and Richardson.

[137], Ex. 1 at p. 1.

On August 22, 2022, Chandler Rogers, Esq. entered an appearance to represent Edwards, joining Donna Smith, Esq., who had previously entered an appearance on Edwards' behalf.[6]

On September 1, 2022, Colom again met with the Government. The MOIA prepared following that meeting states:

> Colom is aware that he is a witness in the Jabari Edwards (Edwards)/Antwann Richardson (Richardson) criminal case while at the same time representing Edwards as a Civil attorney in assisting Edwards with his business as the current Manager.
>
> . . .
>
> Colom stated that one of the tasks given to him by Edwards, is to help Edwards with the J5 business operations. Colom added that

---

[5] At the August 23, 2023 hearing, the Government specifically characterized the meeting with Colom as one in his capacity as a potential witness, and the Defendants never disputed the same.
[6] Smith has since withdrawn as Edwards' counsel of record and is no longer affiliated with the case.

> Edwards is aware that he does not work on criminal law matters. Colom stated that Edwards asked him to be candid and truthful with the investigative team.
>
> Colom advised that he is trying to save the company and is trying to get an understanding of the finances to see how the company and the individuals are liable. Colom added that if there are defaults where the company is liable for repayment of funds, this may cause the company to not be able to survive. . .

[137], Ex. 2 at p. 1.

On September 28, 2022, Colom entered an appearance in this case on behalf of the following "interested parties": J5 GBL, LLC; J5 Solutions, LLC; Edwards Enterprises, LLC; The Bridge Group, LLC; BH Properties, LLC; and Build Development Group, LLC. On behalf of those "interested parties," Colom later filed a Motion to Dismiss Forfeiture Counts and Seizure of Property [40], wherein he requested that the Court dismiss the forfeiture counts against those entities. In the Motion [40], Colom described Edwards and Richardson as "two senior managers of the [interested parties][.]" *Id.* at p. 1. On November 1, 2022, the Court entered an Order [51] denying the request, explaining that the request itself was procedurally premature and in contravention to Fifth Circuit precedent.

On January 5, 2023, the Government filed a Motion to Partially Vacate Restraining Order [80]. The Motion [80], which remains pending at this time, concerns the Court Square Tower property and provides in pertinent part:

> 2. J5 Towers LLC was formed on or about January 24, 2022. During the same month, J5 Towers LLC contracted with Wilbur Colom to purchase the Court Square Tower property in Columbus, MS. Mr. Colom owned Court Square Tower and provided owner financing to J5 Towers LLC. The terms of the financing required J5 Towers LLC to make monthly interest payments to Mr. Colom with a final balloon payment of $1.2 million owed to Mr. Colom by December 31, 2022. The terms of the financing were

4

        memorialized by the execution of a promissory note and deed of trust in favor of Mr. Colom.

3.     Mr. Colom has advised the United States that J5 Towers LLC made only a few months of interest payments during 2022. As such, Mr. Colom is owed in excess of $100,000.00 in past due interest payments and J5 Towers LLC has failed to pay the final balloon payment of $1.2 million. Mr. Colom intends to exercise his right of foreclosure under the terms of the note and deed of trust.

4.     Based on the amount of the secured lien in favor of Mr. Colom, the United States does not believe that sufficient equity exists in the property to make the pursuit of forfeiture worthwhile at this time. To the extent that the foreclosure of the Court Square Tower property by Mr. Colom realizes any amount in excess of the amount owed to Mr. Colom then the United States reserves its right to pursue forfeiture of that amount as allowed by law. Mr. Colom has agreed that any amount in excess of the amount owed to him will be held in trust.

5.     Based on the foregoing facts, the United States no longer intends to pursue forfeiture of the "Real Property generally identified as Court Square Tower" at this time, and, as such, the real property should be released from the Restraining Order.

[80] at p. 1-2.

On March 1, 2023, Fifth Circuit Court of Appeals Chief Judge Richman entered an Order [90] "recogniz[ing] a potential conflict of interest regarding Wilbur O. Colom, Esq., in connection with this case." [90] at p. 1. Chief Judge Richman directed the Clerk of Court to open a separate miscellaneous case related to the criminal case for a review of the conflict of interest matter. The miscellaneous case was assigned to Senior United States District Judge Walter of the Western District of Louisiana.

On April 11-12, 2023, the Court held a suppression hearing in the case. Hours before the suppression hearing commenced on April 11, 2023, Colom entered an appearance as counsel of

record for Edwards. When the hearing began, the Government orally raised a concern with Colom's involvement, in light of his potential conflict of interest and Chief Judge Richman's Order [90]. This Court agreed that Colom should not be permitted to participate in light of the ongoing conflict of interest issue and therefore did not allow Colom to sit at counsel table or participate as counsel during the April 11-12, 2023 hearing. On May 10, 2023, Senior Judge Walter entered an Order closing the miscellaneous case. *See* [10], N.D. Miss. Cause No. 1:23-MC-1-DEW. In closing the case, the Order made no specific findings.

Colom has since continued to represent Edwards, making various filings on his behalf in the case. As indicated above, on July 13, 2023, the Government filed a Notice of Potential Conflict of Interest and Motion for a Hearing [137]. The Court addressed that Motion [137], along with others, at the August 23, 2023 hearing. During the hearing, the Defendants urged the Court to allow Colom to continue in his representation of Edwards, arguing that Edwards' Sixth Amendment right to counsel of his choice outweighs any potential conflict of interest.

"The Sixth Amendment to the Constitution guarantees that 'in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'" *United States v. Gharbi*, 510 F.3d 550, 553 (5th Cir. 2007) (quoting U.S. CONST. AMEND. VI). "Part of this guarantee is a criminal defendant's right to retain the attorney of his choice." *Id*. (citing *Powell v. Alabama*, 287 U.S. 45, 53, 53 S. Ct. 55, 77 L. Ed. 158 (1932)). "The right to counsel of choice, however, is not absolute. Rather, 'the essential aim of the Sixth Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.'" *Id*. (quoting *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988)); *see also United States v. Youngblood*, 576 F. App'x 403, 408 (5th Cir. 2014) (quoting *United States v. Vaquero*, 997 F.2d

6

78, 89 (5th Cir. 1993)) ("The Sixth Amendment right to counsel includes the 'right to representation that is free from any conflict of interest.'").

In light of a criminal defendant's Sixth Amendment right to counsel of choice, "there is a presumption in favor of a defendant's counsel of choice, but that presumption may be overcome by an actual conflict of interest, or by a showing of a serious potential for conflict." *Gharbi*, 510 F.3d at 553 (citing *Wheat*, 485 U.S. at 164). This is so even if the defendant desires to waive the potential conflict. *Id*. Discussing a potential waiver of a conflict of interest, the Fifth Circuit further explained:

> A valid waiver does not end the inquiry because the district court has an *independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them*. If a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver. Because the likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, we afford the district court substantial latitude in refusing a waiver where a potential conflict may or may not develop into an actual conflict at trial. We will not reverse a district court's disqualification of counsel for conflict unless the defendant can show the district court abused its substantial discretion in this area.

*Id*. (citations and quotation marks omitted; emphasis added).

In its Motion [137], the Government raised two areas of a potential conflict of interest: "First, Colom and his (or Edwards') employee, Sophia Erby[,] both have personal knowledge of Defendants' pre-and-post indictment business affairs and may be called as witnesses in this matter. Second, the business and personal interests between Colom and Edwards appear to be tightly intertwined and have been for some time." [137] at p. 5. In addition, at the hearing, the Government raised a third area of concern—the impact that Colom's representation of Edwards could have on Richardson.

The Court will address these issues in turn, looking first to Erby. By way of background (and based upon another MOIA attached to the Government's Motion [137]), in 2017, Edwards hired Erby to work as a property manager for BH Properties (one of the "interested parties" on behalf of which Colom has already entered an appearance in this case). In 2018, Erby's responsibilities were increased, and she began working with the North Atlantic Security business, performing administrative duties. In 2020, Erby began again working with BH Properties.

Erby is no longer employed with Edwards. Now, she works for Colom. The MOIA describes that employment situation as follows:

> Erby currently works for Wilbur Colom and is no longer paid by Edwards. Erby started working for Colom approximately two weeks after the Edwards and Richardson arrest[s]. Erby clarified that she has always worked for Colom receiving a 1099, even when she was working for Edwards. Erby added that she helps Colom with day to day activities for Edwards' companies as Colom has taken over Edwards['] companies since the arrests.

[137], Ex. 3 at p. 5-6.

Erby met with the Government for an interview on August 17, 2022. At that meeting, she was represented by separate counsel, Nicole Clinkscales, Esq.

After the Government filed the present Motion [137], Erby executed an affidavit waiving any potential conflict of interest. The affidavit provides in pertinent part:

> 3.    I had two material interviews with the government agents and each time I was represented by Attorney Nicole Clinkscales. If I have to testify in court, I will also be represented by Attorney Nicole Clinkscales. Mr. Wilbur O. Colom was not present during either of my interviews with the government agents and will not represent me should I be called as a witness in this criminal indictment.
>
> 4.    Since the interviews there has been no suggestion or order prohibiting me from working for Wilbur O. Colom.

> 5.     I am the only remaining employee of any of the J5 companies still working on its affairs and able to assist Mr. Colom with winding down the J5 companies. I have also been assisting in the multiple suits filed against the companies and the organizing of records in the case filed by the United States.

[143], Ex. 2 at p. 2-3.

Although aware of Erby's waiver, the Court finds that it misses the mark. The waiver concerns Erby's interests and waives any conflict she might have with Colom. However, Erby is not a defendant in this case. Rather than Erby, the Court is concerned with how Colom's involvement impacts Edwards and Richardson—the two Defendants in *this* case.

The Fifth Circuit addressed a non-identical, but somewhat similar, issue in *United States v. Gharbi*, 510 F.3d 550, 553 (5th Cir. 2007). There, Mohammad Gharbi was one of twenty criminal defendants in a conspiracy case. *Id*. at 552. An issue arose with a potential conflict of interest, which the Fifth Circuit described as follows:

> Gharbi's primary trial counsel was David Reynolds. On the morning of trial, Reynolds informed the district court that he needed assistance in trying the case, and sought to enlist Steve Brittain as co-counsel. The Government objected to this arrangement, arguing that Brittain had a conflict of interest because he also represented Gharbi's daughter, Maryam Gharbi, who was a co-defendant and potential witness in Gharbi's case. Brittain had represented Maryam in negotiating a plea bargain under which she agreed to testify against her father if called by the Government. At the time of the trial, the district judge had not yet accepted Maryam's guilty plea.
>
> Reynolds explained that he and Brittain had erected a "Chinese Wall" between them, and that Brittain would not share any confidential information received from Maryam. Reynolds also stated that Brittain would not cross-examine Maryam in the event she appeared as a witness at trial. Both Gharbi and Maryam testified that they understood and waived any potential conflicts. Nonetheless, the district court found the conflict of interest to be

> unwaivable, and denied Reynolds's request to associate Brittain as
> co-counsel.

*Id*.

On appeal, the Fifth Circuit affirmed the district court's decision as to the conflict of interest issue, holding that the refusal to permit Brittain to represent Gharbi did not violate Gharbi's Sixth Amendment right to choice of counsel. *Id*. at 553. The Fifth Circuit emphasized the fact that if Maryam were called to testify at trial, it would be "impossible to guess whether Gharbi's combined defense team would pull punches" on cross-examination, thereby providing ineffective assistance to Gharbi. *Id*. The Fifth Circuit also noted with approval the district court's consideration of the close family relationship between Gharbi and his daughter, which the district court found could create "pressure either real or perceived" as to Maryam's testimony. *Id*. The Fifth Circuit also cited one of its previous cases, wherein it "affirmed the district court's decision to disqualify a defense attorney who had previously served as counsel for a government witness, citing the potential for 'divided loyalties.'" *Id*. at 554 (quoting *United States v. Millsaps*, 157 F.3d 989, 996 (5th Cir. 1998)).

While not factually identical, the Court sees some similarities between *Gharbi* and this case and shares some of the same concerns. Should Erby be called to testify as a witness at trial, it is quite possible that Edwards' counsel would need to examine her before the jury. This would potentially impose on the Court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," as Colom would need to examine his own employee in open court. *See Gharbi*, 510 F.3d at 553. Though at this time the Court is not familiar with the intricacies of Erby's potential testimony, it is possible that effective representation of Edwards would require

hostile questioning of Erby. In other words, Colom could be placed in a scenario involving "divided loyalties."

Although not in and of itself outcome determinative, the potential conflict involving Erby and Colom—regardless of whether the Defendants openly identify it—gives this Court concern.

Next, the Court turns to Colom's involvement in Edwards' business affairs. As explained above, J5 Towers LLC purchased Court Square Tower from Colom via an owner-financing agreement. At the hearing, the Defendants explained that Edwards is the President or Owner of J5 Towers LLC and Richardson is a Managing Member. In that capacity, Richardson signed the deed of trust in favor of Colom on Court Square Tower.

As noted above, in the Motion to Partially Vacate [80], the Government explains that J5 Towers LLC has not made the required payments, and Colom therefore desires to foreclose on the property. In other words, Colom desires to foreclose on the property of an LLC of which Edwards is the President or Owner and Richardson holds (or at least held) the title of Managing Member.[7] This clearly appears to be a business transaction between an attorney and client.

"The Court's Local Rules provide that attorneys who make an appearance before this Court are bound by the Mississippi Rules of Professional Conduct and are subject to discipline for violating them." *Estate of Rodriguez by and through Rodriguez v. Scott M. Favre Public Adjuster, LLC*, 2022 WL 4241276, at *2 (S.D. Miss. Sept. 14, 2022) (citing L.U. Civ. R. 83.5). Rule 1.8 of the Mississippi Rules of Professional Conduct provides in pertinent part:

> (a)     A lawyer *shall not* enter into a business transaction with a
>           client or knowingly acquire an ownership, possessory,
>           security or pecuniary interest adverse to a client unless:

---

[7] Although Richardson's specific title was not clearly articulated at the hearing, the Court notes that the documentation attached to the Motion [40] Colom filed in his representation of the "interested parties" identifies Richardson as the "Managing Member." *See* [40], Ex. 18 at p. 7.

> (1)    the transaction and terms on which the lawyer acquires the interests are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
> (2)    the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>
> (3)    the client consents in writing thereto.

MISS. R. PROF. COND. 1.8(a) (emphasis added).

The Court recognizes that Edwards has executed a waiver in this case, waiving any potential conflict between himself and Colom. And although Colom did not represent Edwards in this criminal matter as of January 25, 2022 (the date when Court Square Tower was purchased), he did, according to the MOIA, represent Edwards' businesses in civil litigation at that time. In other words, it appears as though there was an attorney-client relationship between Colom and Edwards at the time of the Court Square Tower purchase. Although, again, the waiver indicates that Edwards waives any conflict with Colom as it pertains to Court Square Tower, the Court cannot help but note that nothing in the waiver indicates that Edwards was provided an opportunity to seek the advice of independent counsel prior to entering into the Court Square Tower transaction, as required by the clear language of Rule 1.8. This, of course, does not necessarily mean that the same did not occur but again the Court feels compelled to note the absence of such language in the waiver.

However, while this fact does give this Court significant concern as it pertains to Colom and his compliance with the Rules of Professional Conduct, the Court likewise recognizes that the particular issue currently before it is whether Colom should be permitted to continue to represent Edwards in this proceeding. As far as Court Square Tower pertains to this particular

criminal prosecution, the Court acknowledges that Edwards does not believe it creates a conflict of interest between himself and Colom. However, as emphasized above, courts have an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Gharbi*, 510 F.3d at 553. In light of this independent interest, the lack of clarity on this point gives this Court pause.

Also at the hearing, the Court inquired as to whether Colom has had an interest in any other business or property in which Edwards—individually or by corporate holding—held an interest. Defense counsel represented that Colom also held an interest in an LLC called "J5 Café"—a coffee company Edwards created. The Defendants represented that Colom held an interest in J5 Café prior to this criminal prosecution but that Colom's interests were divested shortly after the filing of the Indictment [1]. As to other contractual relationships between them, Edwards advised the Court that Colom also represents North Atlantic Security in a civil lawsuit. If North Atlantic Security is successful in that proceeding, Edwards will compensate Colom in some undisclosed (and unknown at this time) manner.

The Court's biggest concern with Edwards and Colom's other business dealings is Colom's representation of Edwards' businesses—both in other civil litigation, as well as in *this* criminal case. In his Response [143], Edwards argues that "[r]epresenting an individual and his companies simultaneously does not present a conflict of interest for a lawyer." [143] at p. 2. Edwards cites no authority for this sweeping contention.

Despite Edwards' unsupported contention, the Court can envision several scenarios wherein simultaneous representation of an individual and the individual's corporate entities

could in fact create a conflict of interest. Stated differently, it is quite possible that an entity may not have identical interests to those of an individual owner.

Colom's involvement with Edwards' businesses, which apparently continues to this day, gives this Court concern as it pertains to Colom representing Edwards in this case.

The Court next looks to the way in which Colom's representation of Edwards impacts Richardson. Notably, Edwards has signed a waiver of any conflict of interest. Richardson has not.[8]

Throughout this case, it has been no secret whatsoever that Colom represents several of Edwards' businesses and is closely involved with their affairs. Even in this specific criminal case, Colom entered an appearance and filed a Motion [40] on behalf of several of those entities. As noted above, Colom himself, in that filing, described Edwards and Richardson as "two senior managers of [the entities]." [40] at p. 1. In the Motion [40], Colom also refers to North Atlantic Security as "one of the companies Edwards *and* Richardson managed[.]" [40] at p. 2 (emphasis added).

Colom's involvement with several of the subject businesses in the past gives this Court significant concerns insofar as it pertains to the impact that his representation of Edwards would have on Richardson. Based upon Colom's own filings in this case, it cannot be seriously disputed that his representation of the businesses in the past has involved Richardson. The Court is, of course, unaware of the extent of the legal advice Colom has provided specifically to Richardson during that representation. But Colom would quite likely have learned information about Richardson during the course of that representation.

---

[8] In making this observation, the Court is no way implying that Richardson should or should not sign a waiver nor does the Court make any finding as to whether or not it would accept a waiver should one be filed.

At trial, should the Defendants' respective interests diverge—or, in other words, it become necessary for one of the Defendants to attempt to cast blame on the other—Colom (and, in turn, Richardson) would undeniably be in a precarious situation. On the one hand, zealous and effective representation of Edwards would require him to pass blame on Richardson. But on the other hand, he has represented businesses of which Richardson was—and perhaps currently is— a senior manager (by his own words). This gives the Court significant concerns as to whether Richardson would be unfairly prejudiced insofar as Colom is permitted to represent Edwards in this matter.

Likewise, the Court notes that, despite specifically advising Magistrate Judge Percy at the initial appearance that he did not represent *either* of the Defendants (and that he would not do so), he spoke on behalf of *both* of them when he advised the Court that the Defendants had already had an opportunity to review the charges against them in the original Indictment [1]. The Court is unaware of what conversations, if any, that Colom had with Richardson regarding those charges prior to the hearing, but it is clear that Colom spoke on behalf of Richardson at that hearing. This, too, gives the Court concern.

Ultimately, "[c]ourts have an 'independent interest' in ensuring the fairness of trials, even if the defendant has waived any conflicts of interest." *United States v. Sanchez Guerrero*, 546 F.3d 328, 333 (5th Cir. 2008) (citing *Wheat*, 486 U.S. at 160). The Court takes seriously the need to protect Edwards' Sixth Amendment right. However, taking into account all of the concerns articulated above, the Court finds that there is an actual conflict of interest. At a minimum, there is a serious potential for conflict with Colom's continued involvement in this case. In reaching this conclusion, the Court does not necessarily rely on any one separate "category" of potential conflict addressed above, but the cumulative effect of all of them cannot, in this Court's view, be

ignored. However, the Court does note that its greatest concern is based upon the impact that Colom's potential representation of Edwards would have on Richardson.

District courts are afforded substantial latitude in making rulings in this area. *See Wheat*, 486 U.S. at 163. Exercising its discretion, the Court finds that Colom should not be permitted to proceed as counsel for Edwards. The Motion [137] is GRANTED. Colom is hereby DISQUALIFIED from representing Edwards in this case. He will be terminated as counsel of record for Edwards on the docket.

II.    *Edwards' Motion to Compel Disclosure of Witnesses and Documents [139]*

On July 17, 2023, Edwards moved for an order compelling the Government to provide certain information. In essence, Edwards requests that the Court order the Government to disclose:

(1)    the name, address, and telephone number of witnesses from the SBA that the Government intends to call at trial;

(2)    the expenditures the Government proposes to introduce as being "unapproved, impermissible, and unauthorized expenditures"; and

(3)    the regulations or guidelines on permissible and impermissible uses of PPP or EIDL funds the Government claims that Edwards violated.

At the August 23, 2023 hearing, the Government specifically stated that it only intends to call two SBA witnesses and that both of them have been disclosed to the Defendants. That issue is therefore moot.

As to the expenditures that the Government intends to introduce as being unapproved, impermissible, and unauthorized, the Court first notes that the Government takes the position that *all* expenditures fall into these categories because the Defendants obtained all of the loans through fraudulent means. Regarding the specific expenses that the Government intends to rely

upon at trial, the Court notes that Edwards cites no authority indicating that the Government must specifically disclose the evidence upon which it intends to rely at trial. However, the Government makes the representation that any such evidence will come from the documentation that has been disclosed in discovery. Edwards' unsupported request for a more detailed disclosure is not well-taken.

Lastly, Edwards requests disclosure of regulations or guidelines that the Government contends he violated. In essence, Edwards' argument is that the Government should be limited to presenting argument related to rules and regulations that are either: (1) listed on the SBA's website; and/or (2) disclosed in discovery. Reliance upon any other rules or regulations would, in Edwards' view, constitute unfair surprise at trial.

At the hearing, the Court expressed agreement with Edwards' position. However, the Court explained to defense counsel that, should the testimony of either SBA witness go beyond the scope of the information located on the SBA website or produced in discovery, the Court should be made aware of the same so that the issue can be rectified.

With the caveats provided above, the Motion [139] is DENIED.

II.     *Motion to Compel Production of Giglio Material [147]; Motion to Exclude [161]*

Richardson has filed a Motion to Compel [147], wherein he requests that the Court order the Government to produce *Giglio* material relevant to Agent Vignogna. Edwards filed a Joinder [153] to the request. In making this request, Richardson recounts an issue that arose at the suppression hearing involving Agent Vignogna's failure to disclose that several years prior he had been "the subject of a workplace complaint for threatening and harassing a former female coworker, with whom he had been involved in an intimate relationship." [147] at p. 2. The Court ultimately excluded Agent Vignogna's testimony for purposes of the suppression hearing.

17

In his Motion [147], Richardson further explains that he learned through additional independent research that Agent Vignogna is involved with a security company named Global Threat Solutions, LLC. Richardson contends that:

> 10.     Of note, Global Threat Solutions provides *armed and unarmed security* for government entities and businesses. North Atlantic Security, one of the corporate entities involved in this matter and investigated by Agent Vignogna for over two years prior to the indictment, performed armed and unarmed security for government entities and businesses and bid for business in the same jurisdictions where Global Threat Solutions provided the same or similar security services.
>
> . . .
>
> 12.     According to [Department of Treasury] policy, outside employment is "generally allowed but requires written approval from the employee's supervisor, and review for possible conflicts of interest. . ." Any employee "seeking approval for secondary employment should complete [an] Outside Employment and Other Outside Activity Request Form."

*Id*. at p. 3-4 (emphasis previously added; citation omitted).

After noting these issues, Richardson requests that the Court order the Government to review and provide him any *Giglio* material concerning Agent Vignogna's prior testimony as a federal agent. He also asks for *Giglio* material pertaining to Agent Vignogna's secondary employment "[a]s a result of the concern generated by Agent Vignogna's secondary employment and business association with a company engaged in the same or similar business to a company he investigated for years prior to indictment[.]" *Id*. at p. 6.

Additionally, Richardson filed a separate Motion to Exclude [161], seeking to altogether preclude Agent Vignogna from testifying at trial. The Motion [161] is based upon the same facts underlying the Motion to Compel [147].

18

In its Response [164], the Government represents that it does not intend to call Agent Vignogna as a witness at trial. The Government therefore avers that Richardson's requests are moot.

In light of the Government's representation that Agent Vignogna will not be called to testify at trial, Richardson's Motion [161] seeking to altogether exclude Agent Vignogna from testifying is moot. It is DENIED. Agent Vignogna will not be permitted to testify at trial.

Although Richardson concedes that the Motion to Exclude [161] is moot, he contends that the Motion to Compel [147] is not. Specifically, he argues that the Government should still be mandated to disclose *Giglio* material associated with Agent Vignogna. In essence, Richardson takes the position that the Government should not be permitted to moot its *Giglio* obligations simply by stipulating not to call Agent Vignogna as a witness.

Under *Giglio* and its progeny, the Government must "produce impeachment evidence or evidence which shows a prosecution witness's bias or interest and thereby affects the credibility of the witness's testimony." *United States v. Hall*, 2023 WL 2895284, at *3 (N.D. Tex. Apr. 11, 2023) (citing *Giglio v. United States*, 405 U.S. 150, 153-55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)).

The precise issue before the Court is slightly different than the typical *Giglio* scenario. Specifically, the pertinent question is whether the Government must disclose *Giglio* information for a witness who will not testify at trial but who: (1) has previously testified falsely in a suppression hearing in the case; and (2) was significantly involved in the underlying investigation that led to the bringing of criminal charges.

To support their position, the Defendants direct the Court's attention to the Second Circuit's decision in *United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003). In *Jackson*, the

Second Circuit addressed whether the Government was under an obligation to disclose impeachment evidence of a non-testifying confidential informant. *Id*. at 70. The Second Circuit specifically explained that "[a]lthough we have never expressly stated that the government must disclose exculpatory and impeachment materials pertaining to nontestifying witnesses, that conclusion flows ineluctably from our prior cases." *Id*. Then, the Second Circuit recounted two of its previous cases and provided the following explanation:

> In *Leka v. Portunondo*, 257 F.3d 89 (2d Cir. 2001), for example, we found a *Brady* violation—and granted habeas relief—based on a prosecutor's failure to disclose exculpatory information from a police officer who did not testify at the defendant's trial. *Id*. at 102-03, 106. The officer's observations of the crime scene "were favorable to the defense" and contradicted the observations of two eyewitnesses who testified for the prosecution. *Id*. at 99.
>
> We considered a similar situation in *United States v. Orena*, 145 F.3d 551 (2d Cir. 1998), where "the district court granted the defendants' motions for a new trial on the basis that the government violated its *Brady* obligations by failing to disclose information that defendants could have used to impeach the credibility of out-of-court statements made by a co-conspirator . . . that were admitted at trial under Fed. R. Evid. 801(d)(2)(E)." *Id*. at 553 (citation omitted). The undisclosed evidence was the status of an out-of-court declarant as a government informant, as well as several internal FBI documents reflecting that the declarant had lied about other murders and his role in them. We "reversed so much of the order as granted the defendants' motion for a new trial" only because "the impeachment evidence withheld by the government did not meet the *Brady* standard of 'materiality.'" *Id*.
>
> In *Orena* and *Leka*, we did not question *Brady*'s applicability to disclosure concerning out-of-court declarants. Instead, we focused our attention on whether the defendant had established a *Brady* violation. *It is thus clear that Brady and its progeny may require disclosure of exculpatory and/or impeachment materials whether those materials concern a testifying witness or a hearsay declarant. A contrary conclusion would permit the government to avoid disclosure of exculpatory or impeachment material simply by not calling the relevant witness to testify.*

*Id*. (emphasis added; additional citations omitted).

20

The Ninth Circuit has favorably cited *Jackson*, explaining that "[t]here is persuasive authority for the proposition that *Brady* and related obligations extend to non-testifying witnesses." *United States v. Rodriguez*, 482 F. App'x 231, 236 (9th Cir. 2012) (citing *Jackson*, 345 F.3d at 70; *United States v. Flores*, 2011 WL 1100137, at *1 (N.D. Cal. Mar. 24, 2011)); *see also Everhart v. United States*, 2017 WL 1345573, at *3 (W.D. Wash. Apr. 12, 2017) ("While not yet addressed by the Ninth Circuit, other courts have held that *Brady/Giglio* applies to testifying and non-testifying witnesses.") (collecting cases; citations omitted).

The District Court for the Western District of New York has recently addressed a somewhat similar issue. *United States v. Coleman*, 2022 WL 1025034 (W.D. N.Y. Apr. 6, 2022). There, the district judge reversed a magistrate judge's ruling that *Brady/Giglio* material need not be disclosed to the defendant. *Id*. at *1. The defendant requested *Brady/Giglio* material relating to former DEA Special Agent Joseph Bongiovanni, "who Defendant alleges was the lead agent on the case at the time of the controlled buy." *Id*. at *4. Agent Bongiovanni was subsequently indicted on charges of drug distribution, accepting a bribe as a public official, obstruction of justice, and making false statements. *Id*. After the Government made the decision not to call Agent Bongiovanni as a witness at trial, the magistrate judge concluded that "the Government does not have an obligation to produce those documents and records as impeachment material at this time. . . The Magistrate Judge also reasons that because the Government stated it intends to rely on the testimony of other agents who were involved in the investigation of Defendant instead of Bongiovanni, that evidence 'does not depend on the integrity of Bongiovanni' and does not constitute *Brady/Giglio* material." *Id*. at *5.

The District Judge held that the Magistrate Judge's findings "oversimplify the *Brady/Giglio* issue[.]" *Id*. Further, the court explained that "[f]or *Giglio* material, a 'witness' is

not only a testifying witness; it also means a non-testifying hearsay declarant whose out-of-court statement the Government seeks to introduce at trial and who is subject to impeachment pursuant to Federal Rule of Evidence 806." *Id*. The court then favorably cited a decision from another Judge in that District in another case involving Agent Bongiovanni, wherein that Judge held:

> [T]he defense may be entitled to *Giglio* material (A) if the agent testifies at the trial (and here, the Government states that it does not intend to call Bongiovanni to the stand), or (B) if the agent is a "hearsay declarant," even if he is not testifying. As to (B), for example, *if Bongiovanni authored a report used in this case, and another agent who was involved in the investigation testifies at trial but is relying on that report authored by Bongiovanni, such evidence would fall under Giglio.*

*Id*. at *6 (emphasis added).

The District Judge then referred the issue back to the Magistrate Judge to conduct a further hearing and, if necessary, *in camera* review of pertinent documentation. *Id*. at *7. The court also cited a decision of the District Court of the Southern District of New York, wherein that court held that "*Giglio* material must be disclosed regardless of whether the material concerns a testifying witness or a hearsay declarant. . . The issue does not turn on whether the declarant is testifying in court, but whether the declarant's credibility has been put into issue and can thus be attacked." *Id*. at *5 (quoting *United States v. Perez*, 2005 WL 2709160, at *4 (S.D. N.Y. Oct. 20, 2005)).

Here, the Government argues that "the information sought by the defendants regarding SA Vignogna is not *Brady* material and the government is under no obligation to produce it. The information might be impeachment material required to be produced under *Giglio*, but only if SA Vignogna is called by the government to testify. Who the government chooses to call as a witness at trial is a decision to be made by the government." [178] at p. 3. Further, the Government represents that no reports prepared by Agent Vignogna will be utilized at trial—

specifically alleging that "[t]he only report at issue is the report from the statement of Mr. Edwards. This report was authored by SA Bohmer, who was present during the interview of Mr. Edwards." *Id*. at p. 5. In addition, as to the concern that Agent Bohmer's testimony might invoke Agent Vignogna and thus place Agent Vignogna's credibility into question, the Government contends that it "is an issue that should be addressed at trial only if it comes up." *Id*. at p. 6.

The circumstances of the present case are not entirely dissimilar to the above-referenced cases. Agent Vignogna will not testify at the trial of this matter—pursuant to the Government's stipulation (and the Court's ruling herein). Agent Vignogna was, however, the lead investigator in this case. And the Defendants contend that "[h]is credibility is paramount to the entire case, including as to what probable cause led to the government's original investigation shifting course [from the City of Columbus' Blight Program to PPP/EIDL loans], how the government came into possession of certain evidence, and other similar matters questioning the integrity of the investigation." [174] at p. 4. The Defendants then emphasize that Agent Vignogna participated in interviews and statement preparations of eighteen witnesses. They raise concerns as to how the failure to disclose the requested information could prejudice them at trial:

> If Agent Bohmer testifies at trial that Agent Vignogna, rather than he, has knowledge specific to a question relating to those interviews, the defense will be severely prejudiced by not being able to impeach Agent Vignogna's credibility. Likewise, if Agent Bohmer is questioned regarding an affidavit supporting a search warrant executed by Agent Vignogna and he claims that he was not involved in the application for the search warrant so he is unable to answer the question, again the defense will be severely prejudiced by not being able to impeach Agent Vignogna's credibility. And, with respect to the evidence presented to the grand jury by Agent Vignogna, the defense will be extremely prejudiced in its cross examination of Agent Bohmer, regarding the government's investigation and charging of Edwards, if it is unable to impeach the credibility of Agent Vignogna.

> In conclusion, Agent Vignogna was the lead case agent. He has made out-of-court statements that can be impeached. He has interviewed numerous witnesses whose statements are contained in MOIAs and upon who [sic] the government's evidence will rely. He may have possibly authored reports upon which Agent Bohmer, or other government agents, may rely.

*Id.* at p. 6.

Although the Court recognizes the Government's argument that Agent Vignogna will not testify at trial and that the Government believes it can utilize Agent Bohmer for the admission of the necessary documentation to support its case, it is not lost on this Court how the case got to this point. The Government has made the decision not to call its lead case agent, at least in part (if not entirely) because the agent testified falsely in a proceeding before this Court. Although the Government may be able to present documentation to prove its case through Agent Bohmer, the Court agrees with the Defendants' argument. It is quite possible (perhaps likely) that Agent Bohmer's testimony will refer in some way to Agent Vignogna. The Defendants should be able to, at least to some extent, attack Agent Vignogna's credibility as the lead investigator on the case. The parameters of that inquiry can only be determined in the course of trial, but the Court finds that the Defendants are entitled to the *Brady/Giglio* material in order to adequately prepare for that inquiry. As articulated by the Second Circuit in *Jackson*, "[a] contrary conclusion would permit the government to avoid disclosure of exculpatory or impeachment material simply by not calling the relevant witness to testify." *Jackson*, 345 F.3d at 70. This is particularly so in this case when Agent Vignogna has previously testified falsely before this Court.

In light of the foregoing, the Motion to Compel [147] is GRANTED. The Government shall make the required *Brady/Giglio* inquiry as to the areas identified in Richardson's Motion [147] and disclose the applicable documentation as soon as possible but not later than ten (10) days from today's date.

Having made that determination, the Court also notes that, in its Response [164], the Government emphasizes the Defendants' contention that Agent Vignogna had an improper motive underlying his investigation of the Defendants and their businesses. The Government avers that "any alleged connection is not only extremely remote but also pure speculation; there is simply no evidence to support any alleged connection between Agent Vignogna's other employment and the Columbus investigation." [164] at p. 2. Arguing that any mention of an allegedly improper motive would be highly prejudicial, the Government requests that the Court "preclude the defendants from raising at trial, before the jury, the issue of any alleged improper motive for the investigation." *Id*.

First, the request is procedurally improper insofar as it was raised in the Government's Response [164] instead of as a separate Motion, as required by the Local Rules. *See* L.U. CIV. R. 7(b) ("Any written communication with the court that is intended to be an application for relief or other action by the court must be presented by a motion in the form prescribed by this Rule.").[9] Additionally, the request was also made after the Motion deadline of July 31, 2023. *See* [101].

Aside from those procedural deficiencies, the Court finds this request to be premature. "The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *King v. Cole's Poultry, LLC*, 2017 WL 532284, at *1 (N.D. Miss. Feb. 9, 2017) (quoting *Harkness v. Bauhaus U.S.A., Inc.*, 2015 WL 631512, at *1 (N.D. Miss. Feb. 13, 2015)) (additional citations omitted). "Evidence should not be excluded *in limine* unless it is clearly inadmissible on all potential grounds." *Harkness*, 2015 WL 631512 at *1 (quoting *Fair v. Allen*, 2011 WL 830291, at *1 (W.D. La. Mar. 3, 2011)).

---

[9] The Court recognizes that this is a criminal case, yet the quoted rule is located in the Local Uniform Civil Rules. However, the Civil Rules are incorporated by reference into the Local Uniform Criminal Rules. *See* L.U. CRIM. R. 1.

To that end, "[e]videntiary rulings 'should often be deferred until trial so that questions of foundation, relevancy and potential prejudice can be resolved in proper context.'" *King*, 2017 WL 532284 at *1 (quoting *Rivera v. Salazar*, 2008 WL 2966006, at *1 (S.D. Tex. July 30, 2008)) (additional citations omitted).

At this time, the Court is unable to determine whether the alleged motivation underlying the investigation is clearly inadmissible on all potential grounds. The Court will address the issue if it arises at trial. Prior to delving into this issue at trial, the parties shall notify the Court so that the issue can be addressed outside of the presence of the jury, if necessary. The Government's request is DENIED.

### III. *Edwards' First Motion in Limine [148]*

On July 31, 2023, Edwards filed a Motion *in Limine* [148]. The Motion [148] essentially covers three topics.

First, Edwards indicates that the Government has identified Kandace Zelaya, an attorney with the SBA, as a witness to be called at trial. Edwards emphasizes that the Government's disclosure as to Zelaya provides:

> Ms. Zelaya's anticipated testimony does not constitute expert testimony as she is providing factual information regarding the SBA, its programs and the Paycheck Protection [Program] ("PPP"). She is not providing expert opinion.

[148] at p. 1.

In light of the Government's representation in this regard, Edwards requests that the Court "exclude and/or prohibit Kandace Zelaya from offering any expert opinions in this matter." *Id*. at p. 2.

Second, Edwards requests that the Court "exclude and/or prohibit testimony by any Government witness, including its SBA witnesses, which purports to identify any rules and/or

regulations applicable to the PPP and/or EIDL programs which are not specifically located on the [SBA] websites." *Id.* The genesis for this request in this regard comes from the SBA's response to a subpoena duces tecum, wherein the SBA apparently represented that "all rules and regulations regarding PPP and EIDL programs are located on the SBA's websites[.]" *Id.* at p. 2-3.

Lastly, Edwards requests that the Court "limit the testimony by any SBA witnesses to the information which has been provided by the Government in the Government's disclosures." *Id.* at p. 3.

At the hearing, the Court indicated to the parties that it believed Zelaya should be designated as an expert if the Government intends for her to testify as to the SBA rules and regulations. The Government agreed to designate her as an expert witness. That stipulation therefore moots the first aspect of Edwards' Motion [148].

As to the other aspects, the Court is cognizant of the Defendants' concerns. This issue was addressed at the hearing, and the Government represented to the Court that the rules and regulations about which Zelaya will testify are either located on the SBA website and/or specifically disclosed in discovery.

The Court therefore finds the remainder of the Motion [148] to be moot. It is hereby DENIED.[10]

### IV.    *Government's Motion to Exclude Proposed Expert Testimony [149]*

The Government has filed a Motion to Exclude [149], wherein it seeks to preclude the Defendants' experts, Scott Bossom and Matthew K. McCarthy, from testifying at trial. The Government raised three separate areas of concern associated with the experts and their proposed testimony: (1) qualifications; (2) relevance; and (3) reliability.

---

[10] The analysis set forth above as to Zelaya also applies to the other SBA witness, Raymond N. Brown III.

At the hearing, the Court addressed these concerns and advised the parties that the experts would be permitted to testify. In reaching this conclusion, although recognizing the Government's concerns, the Court notes that its role as gatekeeper associated with expert testimony "is not meant 'to serve as a replacement for the adversary system: Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Andrews v. Rosewood Hotels & Resorts, LLC*, 575 F. Supp. 3d 728, 735 (N.D. Tex. 2021) (quoting *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004)) (additional citations omitted). The Court finds that these remedies are sufficient to address the Government's concerns with Bossom and McCarthy's testimony.

In its Motion [149], the Government also requested an opportunity to consult with an expert witness on the tax implications of closing a business—a topic about which McCarthy intends to testify. The Government requested a brief continuance of the current trial date in order to accomplish that task.

At the hearing, the Court addressed this issue and granted the Government permission to designate an expert to rebut McCarthy's opinions. In fact, since that time, the Government has filed a Notice of Disclosure [176], indicating that it has disclosed to the Defendants that it intends to call Charles P. Rafferty as an expert witness at trial.

The Government's Motion to Exclude [149] is DENIED. However, the Government will be permitted to call Rafferty as an expert witness at trial.[11]

---

[11] This ruling in no way impacts the Motion to Strike [177] that Edwards filed on September 5, 2023 in connection with Rafferty.

V.     *Edwards' Second Motion in Limine [159]*

In his Second Motion *in Limine* [159], Edwards addresses the proposed testimony of Raymond N. Brown, III—a Government witness. The Motion [159] provides different arguments based upon whether Brown testifies as a lay witness or an expert witness. At the hearing, the Court indicated, as with Zelaya, that Brown should be designated as an expert in order to provide the testimony that the Government anticipates presenting through him. The Government agreed to designate Brown as an expert.

Edwards' argument as to Brown's proposed expert testimony is that "he must be prohibited from interpreting and explaining statutes, interpretating and explaining regulations, giving legal opinions and offering legal conclusions. He must also be prohibited from defining terms, terms of art and/or phrases which are not defined by the SBA rules and regulations found on the pertinent SBA websites[.]" [160] at p. 5.

As with several other matters, the Court addressed these issues at the August 23, 2023 hearing. The Court cannot, at this stage of the proceedings, provide rulings in the abstract without proper context and foundation. However, the Court will consider objections at trial, as necessary, to ensure that Brown's testimony does not surpass the scope of permissible expert testimony. Having provided that caveat, the Motion [159] is DENIED.

*Conclusion*

For the reasons set forth above, the Government's Motion for Hearing [137] is GRANTED, and Colom is DISQUALIFIED from representing Edwards in this case. The Clerk of Court shall terminate Colom as counsel for Edwards on the docket. The Motion to Compel [147] is GRANTED. The remaining Motions [139, 148, 149, 159, 161] are DENIED.

SO ORDERED, this the 12th day of December, 2023.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE